UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

UNITED STATES OF AMERICA,                          23-CR-00088 (HG)

       - against

CHI KWAN WONG,

          Defendant.

-----------------------------------------------------------X

**SENTENCING MEMORANDUM ON BEHALF OF CHI WONG**

DAVID M. ESKEW
ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
Telephone: (646) 970-7342
Facsimile: (646) 970-7345
E-mail: deskew@aellaw.com

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

DISCUSSION ..................................................................................................... 4

I.    Chi Objects to Certain of the Offense Conduct Attributed to Him in the PSR and
      Contends that He is Entitled to a Mitigating Role Adjustment ......................................... 4

      A.    Chi's Offense Conduct.............................................................................. 6

      B.    Chi is Entitled to the Minor Role Adjustment. ...................................................... 9

II.   There are No Applicable Sentencing Departures at Step Two of the Analysis ............... 16

III.  Consideration of the § 3553(a) Factors Favors a Further Downward Variance............... 16

      A.    Chi's History and Characteristics Warrant a Downward Variance.................... 19

            i.     Chi's Upbringing, Immigration to the U.S., and Dream of
                   Becoming a Pharmacist .......................................................................... 19

            ii.    Chi's Character and Devotion to Helping Others ................................. 21

      B.    The Nature and Circumstances of the Offense Justify a Downward Variance..... 25

      C.    Incarceration Is Not Necessary for Deterrence, Societal Protection, or
            Rehabilitation…………………………………………………………….......... 26

      D.    A Significant Downward Variance Would Avoid Unwarranted Sentencing
            Disparities ...................................................................................... 30

CONCLUSION................................................................................................. 31

## **TABLE OF AUTHORITIES**

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................. 4, 17, 18, 19, 30

*Kimbrough v. United States*, 552 U.S. 85 (2007) ........................................................... 17

*Pepper v. United States*, 562 U.S. 476 (2011) .............................................................. 18

*U.S. v. Jian Ai Chen*, Crim. No. 23-255, ECF # 25 at 4 ................................................. 14

*United States v. Alba*, 933 F.2d 1117, 1121 (2d Cir. 1991) ............................................. 9

*United States v. Collado*, No. 07 CR. 1144 (HB), 2008 WL 2329275
(S.D.N.Y. June 5, 2008) ............................................................................................... 28

*United States v.Crosby*, 397 F.3d 103 (2d Cir. 2005) ....................................................... 4

*United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006) ........................................... 4, 17

*United States v. Franklin*, 902 F.2d 501 (7th Cir. 1990) ................................................. 12

*United States v. Jones*, 460 F.3d 191 (2d Cir. 2006) ...................................................... 17

*United States v. Kirk Tang Yuk*,  885 F.3d 57 (2d Cir. 2018) .................................... 10, 16

*United States v. Knights*, 534 U.S. 112 (2001) ............................................................... 30

*United States v. Manzella*, 475 F.3d 152 (3d Cir. 2007) ................................................ 28

*United States v. Park*, 758 F.3d 193 (2d Cir. 2014) ................................................. 17, 18

*United States v. Perez*, 321 F. Supp. 2d 574, 585–86 (S.D.N.Y. 2003) ......................... 15

*United States v. Shy*, 538 F.3d 933 (8th Cir. 2008) ....................................................... 17

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ................................................... 25

*United States v. Tolla*, 781 F.2d 29 (2d Cir. 1986) ........................................................ 30

*United States v. Wynn*, 37 F.4th 63 (2d Cir. 2022) ........................................................... 9

*United States v. Zimmerman*, No. 10-CR-598 JG, 2012 WL 3779387, at *7 (E.D.N.Y. June 19,
2012) .............................................................................................................................30

**Statutes**

18 U.S.C. § 3553 ............................................................................................................ 19

18 U.S.C. § 3553(a)(1) ............................................................................................. 19, 25

18 U.S.C. § 3553(a)(2) ................................................................................................... 26

U.S.S.G. § 1B1.3 ............................................................................................................. 9

U.S.S.G. § 2B1.1 ............................................................................................................. 9

U.S.S.G. § 3B1.2(b) ..................................................................................................... 5, 9

U.S.S.G. § 3B1.2, cmt. 3(C) ........................................................................... 9, 10, 14, 15

U.S.S.G. § 5B .............................................................................................................. 28

**Rules**

Rules of the Board of Regents, NYS Education Department, § 29(a)(21)(ii) ............................ 7

**Other Authorities**

Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199 (2013) ........... 28

National Institute of Justice, *Five Things About Deterrence*, U.S. Dep't of Justice Off. of Justice
Programs, May 2016, https://www.ojp.gov/pdffiles1/nij/247350.pdf ..................................... 28

*U.S. Probation and Pretrial Services*, "Home Confinement,"
https://www.nyspt.uscourts.gov/forms/Home_Confinement.pdf.............................................. 29

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice
and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421 (2007)......................................... 28

## INTRODUCTION

Until recently, Chi Wong's life story was one of the "American Dream." Born into a low-income home in Hong Kong, China, Chi grew up without a father at home and with limited opportunities. But his roots did not stop him from dreaming big. He had ambitions of coming to the United States and one day working in the healthcare field as a pharmacist. Indeed, from a young age, Chi was motivated to help others. He viewed healthcare workers like "soldiers" who make personal sacrifices and are always there "for society when the community needs [them]."[1] So, against all odds, after completing high school in China, Chi traveled to the United States for college. He went on to obtain his Doctor of Pharmacy degree from the University of Charleston School of Pharmacy in 2015. He was elated, and his family was tremendously proud of his hard work and perseverance to achieve his goals. He later became a naturalized citizen in 2020, which was another source of immense pride. His parents followed in his footsteps by coming to the United States in the hopes of a better life. By 2021, Chi had begun pursuing his greatest ambition yet—attending medical school with the hope of becoming a doctor—and he could not believe his good fortune.

But along the way to achieve his goals, Chi's path took a wrong turn. In 2017, at just 25 years old and only recently a graduate of pharmacy school, Chi associated himself with and trusted the wrong people; older and more experienced members of Chi's close-knit Chinese-American community that led him down a fateful path. A relative of Chi's introduced him to the owners of A Star Pharmacy ("A Star"): Jian Ai "Maggie" Chen, Amanda Hon, and Si Ci Zhu, each a defendant in related criminal cases pending before Your Honor. Chi was hired to work at A Star part-time as a consultant and he was excited to have been connected with others in the Asian-

---

[1] Letter of Pui Wong, Exhibit A.

American pharmacy community and to further his new pharmacist career. He was initially unaware that Chen, Hon, and Zhu were engaged in a healthcare fraud scheme that they had been already running for seven years and in which he would soon become entangled.

Over time, Chi became aware that Chen worked for a doctor who prescribed drugs to be dispensed by A Star while she, at the same time, owned and drew profits from A Star, which was, at best, a conflict of interest and, at worst, a kickback relationship. Chi also knew that A Star paid customers for "loyalty" by providing them with coupons they could use at A Star or other retailers, which, though commonplace within the pharmacy community, also constituted a kickback. Chi knew that the doctor that Chen worked for, among others, prescribed the same drugs that Chi was asked to research and which Chi identified as potentially profitable, even though Chi never had any information about and never participated in any kickbacks to doctors. And Chi assisted in some illegal financial transactions at the direction of A Star's owners by passing checks that were intended to look like legitimate business expenses but were actually a mechanism to obtain cash for the business. Taken together, this conduct forms the basis of Chi's guilty plea in this matter; conduct for which he accepts full responsibility and is deeply remorseful.

But the fair determination of his sentence is in some ways more about what Chi did *not do* than what he *did do*. Chi was in every sense a minor participant in the offense conduct. He did *not* participate at all in the most egregious conduct of Chen and others, played, at best, a fringe role overall, and did not receive money beyond his compensation for his job duties. At A Star, Chi was *not* a supervising pharmacist responsible for general operations and regulatory compliance. He did *not* even work "behind the counter" preparing orders or dispensing drugs and did *not* have a customer-facing role. Rather, Chi was a part-time consultant who was asked by Chen to consult on legitimate pharmacy operations and business matters. For example, he prepared and submitted

2

applications for insurance contracts with payors, he followed-up on missing payments from insurers for dispensed prescriptions, he enrolled A Star in a buying group that decreased wholesale prices, and he compared drug prices amongst wholesalers using publicly available information to reduce the pharmacy's medication purchasing costs and increase profit margins. All of this conduct was perfectly legal in and of itself, and Chi was paid an appropriate salary for his work. Chi also voluntarily left A Star in 2021, before becoming aware of this investigation, to pursue medical school.

Chi's mistakes with A Star are not indicative of his true character or his future potential. As Chi's sister described, upon Chi's graduation from pharmacy school he was "too young and sometimes too naïve," and what was intended as a helpful networking introduction resulted in him "knowing the wrong people [and] being under the wrong influence."[2] As reflected in the more than one dozen letters of support submitted to Your Honor, those closest to Chi are devastated and in disbelief that he is implicated in criminal activity—let alone healthcare fraud. From a young age, Chi was known within his family for his "gentle disposition,"[3] and his primary motivation to pursue a career in healthcare was to help those in need. Chi has shown his devotion to others through his kind attentiveness to his family, particularly his elders, including those back home in China. He is similarly devoted to his community and has a history of volunteer work that predates this case, including offering language translation services and guidance regarding medication issues. Chi also showed immense courage and heart by risking his own health during the COVID-19 pandemic by transporting supplies to hospitals and helping his community wherever possible.

Still a young man today, Chi has a great deal to contribute to society if given the chance. For all of these reasons, taking into account the factors to be considered under 18 U.S.C.

---

[2] *Id.*
[3] Letter of Yin Chau Lam, Exhibit B.

§ 3553(a)—including in particular the nature and circumstances of the offense and Chi's specific role in the conspiracy—we respectfully submit that a non-custodial sentence of probation or home confinement is appropriate in this case. A custodial sentence would derail Chi's life in irreparable ways at this important juncture in his life, compounding what has already been a devastating and shameful mistake, for conduct that, compared to the other participants in this fraud, was relatively minor and not particularly lucrative. Conversely, a sentence that restricts Chi's freedom and imposes measured punishment without formal incarceration would fairly account for his conduct while also taking into account his individualized participation in the conspiracy, his background, personal attributes, and ability to positively contribute to society in the future. We ask that the Court permit him to remain at home as he repays his debt to society and continues his rehabilitative journey.

## DISCUSSION

To determine the defendant's sentence, the Court must follow a three-step process. *See Gall v. United States* 552 U.S. 38, 49 (2007) ("The district court should begin all sentencing proceedings by correctly calculating the applicable guideline range."). The Court must (1) calculate the applicable guidelines range, (2) determine the applicability of any relevant departures under the guidelines, and (3) then consider all factors set forth in 18 U.S.C. § 3553(a) to establish whether a variance is warranted. *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). As set forth below, we respectfully submit that a sentence of probation or home confinement is sufficient but not greater than necessary to achieve the goals of sentencing.

## I.      Chi Objects to Certain of the Offense Conduct Attributed to Him in the PSR and Contends that He is Entitled to a Mitigating Role Adjustment.

In the Presentence Investigation Report, dated April 5, 2024 ("PSR"), the U.S. Probation

Department ("Probation") calculated a total offense level of 19, which together with a criminal history category of I, yielded an advisory guidelines range of 30 to 37 months' imprisonment. PSR ¶ 67. Probation's calculations under the U.S. Sentencing Guidelines are as follows:

| Probation's Calculation | | | |
|---|---|---|---|
| Offense Characteristic | Numerical Calculation | Guidelines Reference | PSR Reference |
| Base Offense Level | 6 | U.S.S.G § 2B1.1(a)(2) | PSR ¶ 57 |
| Loss between $550,000 and $1,500,000 | +14 | U.S.S.G. § 2B1.1(b)(1)(H) | PSR ¶ 58 |
| Loss to Government health care program over $1,000,000 | +2 | U.S.S.G. § 2B1.1(b)(7)(i) | PSR ¶ 59 |
| Use of a special skill | +2 | U.S.S.G. § 3B1.3 | PSR ¶ 61 |
| Zero-Point Offender | -2 | U.S.S.G. § 4C1.1(a) and (b) | PSR ¶ 64 |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1(a) and (b) | PSR ¶¶ 65-66 |
| Probation's Total Adjusted Offense Level | 19 | | PSR ¶ 67 |
| Criminal History Category | I | | PSR ¶¶ 70 |
| Probation's Applicable Guidelines Range | 30 – 37 Months | | PSR ¶ 114 |

As set forth in greater detail below, we disagree with Probation's calculations at step one of the sentencing analysis because *(i)* we believe that Probation incorrectly attributed certain offense conduct to Chi; and *(ii)* relatedly, because Chi is entitled to a mitigating role adjustment when his conduct is viewed in the correct factual context.[4] If the Court were to apply the 2-level mitigating role adjustment pursuant to U.S.S.G. § 3B1.2(b), the correct calculation would be a total adjusted offense level of 17 and an advisory guidelines range of 24 to 30 months' imprisonment.

The PSR is not just about Chi. Rather, as is often the case when multiple defendants are implicated in one conspiracy or scheme, the PSR includes information (provided to Probation by the government) about several defendants, including Chi. Consequently, many of the allegations in the PSR address the conduct of *other* defendants and do not implicate or even mention Chi. *See,*

---

[4] The plea agreement in this case specifically contains a carveout that allows the defense to argue for the mitigating role adjustment because relative culpability within the conspiracy has been a central issue since the outset of this case and during the parties' negotiation of a resolution.

*e.g.,* PSR ¶¶ 26 - 31. While this approach makes sense for preserving Probation's resources, the result is that the PSR contains reference to much conduct in which Chi was not directly involved or even knowledgeable.

On May 2, 2024, following the first disclosure of the PSR, we objected by letter to Probation of the denial of a minor role adjustment and to certain factual statements in the PSR that, in our view, failed to accurately distinguish Chi's conduct from that of other defendants. On May 24, 2024, the government responded with a letter of its own to Probation. On July 12, 2024, Probation issued an Addendum to the PSR, summarizing the objections and the government's responses and declining to accept defendant's proposed revisions, with the exception of typographical changes. *See* Addendum to the PSR.

Respectfully, it is our view that the factual statements in the PSR are essential not only to the mitigating role analysis but to the relative apportionment of guilt within the conspiracy and to a fair sentencing overall under the § 3553(a) factors. Accordingly, we renew our original objections to the PSR, which are restated below. We also note that the Addendum to the PSR contains certain additional factual inaccuracies, which are identified below, and we accordingly object to these statements as well.

### A.     Chi's Offense Conduct.

Chi became a licensed pharmacist in 2015. PSR ¶ 94. Shortly thereafter, in or about December 2017, Chi was introduced to A Star's owners—Jian Ai "Maggie" Chen, Amanda Hon, and Si Ci Zhu. Chi was hired to work at A Star Pharmacy as a consultant to, among other things, assist with pharmacy operations. This was more than seven years *after* Chen, Hon, and Zhu began running their fraud scheme in January 2010. *Id.* ¶ 25. Chi was affiliated only with A Star and was not involved in any capacity with AC Pharmacy, the second pharmacy that Chen, Hon, and Zhu used to carry out the fraud scheme.

6

Chi did not possess any equity interest in A Star and was never an owner. He was hired on a "part-time" basis and neither performed the duties of a "supervising pharmacist" nor worked "behind the counter" at the pharmacy dispensing prescription medications to patients. He did not "oversee the practice of other employed pharmacists," did not set or review pharmacy policies, and was not in charge of maintaining compliance with applicable regulations. *See, e.g.,* Rules of the Board of Regents, NYS Education Department, § 29(a)(21)(ii) (describing the role of a supervising pharmacist). Rather, Chi mainly consulted on pharmacy operations and business matters. For example, he prepared and submitted applications for insurance contracts with payors such as Medicaid and other insurers. He checked and followed-up on missing payments for dispensed prescriptions from insurers. And he was asked to compare drug prices amongst wholesalers to reduce the pharmacy's medication purchasing costs and increase profit margins. He also enrolled A Star in a buying group that decreased wholesale prices and signed up for commercial purchasing platforms where he tracked drug prices and alerted management, at the request of Chen, to attractive drug pricing.

Chi stopped working at A Star in 2021 to attend medical school. During the three years he worked at A Star (December 2017 to January 2021), Chi received a total of approximately $338,235.27 in compensation, which is approximately $112,745.09 per year on average. This is significantly *less than* the median salary for a pharmacist in New York. *See* United States Bureau of Labor Statistics, Occupational Employment and Wage Statistics (2023): New York State, (showing the median pharmacist salary in NY State was $134,360 in 2023 and 75% of pharmacists earned more than $123,790).

Several of the paragraphs in the PSR attributing or implicating Chi in certain offense conduct are incorrect or misplaced and the PSR fails to note Chi's relative role in the scheme. Our objections to the PSR are as follows:

1. The PSR does not clearly state that Mr. Wong was a "part-time consultant" who was not an owner of A Star and had no involvement in AC Pharmacy. Rather, the PSR casts doubt by stating that Chi "worked at A Star as a purported consultant," language lifted directly from the criminal complaint. PSR ¶¶ 15, 20.

2. The PSR described in detail criminal conduct over a broad period of time (2010 to 2021) relating to AC Pharmacy. The PSR does not clarify that Chi became embroiled in the scheme for a much shorter period of time (2017 to 2021) and was never involved in any way in the activities of AC Pharmacy. *See id.* ¶¶ 25-31.

3. The PSR states that Chi provided information about profitable prescription drugs to Hon and Chen so that Chen could procure those prescriptions "without regard to medical necessity." *Id.* ¶ 32. The PSR does not make clear that the information provided by Chi was *publicly available* and that Chi did not directly participate in "procuring" prescriptions or dispensing them.

4. The PSR states that Chi was "involved in the medically unnecessary dispensary of other drugs, aside from diclofenac epolamine," potentially warranting an upward departure. *Id.* ¶¶ 35, 47. This is *not* factually accurate. Chi never communicated with Dr. Yiu, had no knowledge of the payment of any kickbacks to Dr. Yiu or any other doctor, and did not dispense drugs on behalf of A Star or any other pharmacy.

5. The PSR states that Chi created and caused to be created checks and fabricated invoices. *Id.* ¶ 41. This is *not* factually accurate. Chi passed a limited number of checks written by Zhu and he never created any checks or fabricated any invoices. Indeed, Chi had no authority to write checks on behalf of A Star. As reflected in his plea allocution, Chi was aware that many of the checks Zhu provided to him were illegitimate and that he aided in this scheme by passing checks and obtaining cash in return at the direction of Zhu and others.

6. The PSR states that Chi had a "proprietary interest in the scheme[.]" *Id.* ¶ 46. In fact, Chi did not have any ownership interest in A Star and was paid for his consulting services in amounts commensurate with his work and experience.

Though some of the above may seem like nuanced factual distinctions, the sum total effect of these incorrect factual statements is the impression that Chi was a greater participant in the

scheme than he actually was. To be clear, Chi is not running away or minimizing his conduct. He accepts full responsibility for his conduct and is remorseful. But he should not be sentenced for conduct he did not commit, and these facts are critical in understanding his minor role relative to other participants, as discussed in the next section below.

**B.**     **Chi is Entitled to the Minor Role Adjustment.**

The Court should apply the two-level mitigating role adjustment in § 3B1.2(b) when calculating Chi's guidelines range. A two-level decrease is warranted "[i]f the defendant was a minor participant in any criminal activity." U.S.S.G. § 3B1.2(b). The minor role analysis is "based on the totality of the circumstances and involves a determination that is heavily dependent on the facts of the particular case." *Id.*, cmt. 3(C); *see United States v. Alba*, 933 F.2d 1117, 1121 (2d Cir. 1991) (courts have discretion as to the size of a reduction based on the defendant's role in the criminal activity).

In determining whether a defendant played a minor role in the criminal conduct, courts consider the following "non-exhaustive list of factors:"

(i)     the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)     the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)     the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)     the nature and extent of the defendant's participation in the commission of criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)     the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, cmt. 3(C); *see also United States v. Wynn*, 37 F.4th 63, 69 (2d Cir. 2022) (holding the court "erred in denying [the defendant] a mitigating role adjustment without first

addressing many relevant factors that appear to support such an adjustment"). In addition, the Sentencing Commission explained that:

> [A] defendant who is accountable under § 1B1.3 for a loss amount under § 2B1.1 (Theft, Property, Destruction, and Fraud) that greatly exceeds the defendant's **personal gain** from a fraud offense or who had **limited knowledge** of the scope of the scheme may receive an adjustment under this guideline. For example, a defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who receives little personal gain relative to the loss amount, may receive an adjustment under this guideline.

U.S.S.G. § 3B1.2, cmt. 3(A) (emphases added). The Application Note further states that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." U.S.S.G. § 3B1.2, cmt. 3(C). Moreover, "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative." *Id.* Rather, "[s]uch a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." *Id.* The Second Circuit has held that this "average participant" language "specifically refers to the defendant's 'co-participants in the case at hand'" rather than to some hypothetical "average" criminal defendant. *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 88 n.16 (2d Cir. 2018).

*As to the first factor—the degree to which the defendant understood the scope and structure of the criminal activity*—Chi's knowledge of the fraud scheme is limited in both time and scope. Chen, Hon, and Zhu began the fraud scheme in 2010, *seven years* before Chi began working at A Star, and they continued it for over a decade. Chi only participated in the fraud for three years "between approximately December 2017 and January 2021." Indictment ¶ 16, ECF #1. The fraud also involved two pharmacies, A Star and AC Pharmacy, but Chi's role was limited to A Star only;

10

he had no connection to AC Pharmacy. Thus, without even addressing the specific conduct at issue, it is apparent that Chi is significantly less culpable than these other defendants, who were running a much longer and broader fraud than anything Chi was ever present for or privy to.

Moreover, in terms of the specific conduct involving A Star during the years of Chi's employment, he did not participate in and did not have knowledge of the most egregious conduct—the payment of bribes in exchange for referrals from physicians, including from Dr. Yiu and Clinic-1. In fact, Chi had no direct interaction with Clinic-1, with Dr. Yiu, or with any other physician who sent prescriptions to A Star Pharmacy. Again, Chi was a consultant to A Star who carried out isolated tasks as requested by the owners. In contrast, Chen, Hon, Zhu, and Dr. Yiu all accepted, solicited, and/or paid bribes in exchange for referrals between physicians and A Star.

The government characterizes Chi as deploying "willful blindness" to this piece of the conspiracy because his research, at the request of Chen and Hon, identified diclofenac epolamine as a potentially profitable drug. *See* Addendum to the PSR at 4. But while Chi was generally aware that A Star received prescriptions for this medication, he was not aware that his co-conspirators procured these prescriptions using bribes. Indeed, Chi's involvement in this conduct was limited to conducting publicly available research regarding drug prices. And once he completed his assignment, his co-conspirators had no need to involve him in the physician kickback scheme, which they had orchestrated and operationalized long before his employment.

*As to the second factor—the degree to which the defendant participated in planning or organizing the criminal activity*—Chi played no role in planning or organizing the relevant criminal conduct. Again, it is not in dispute that Chen, Hon, and Zhu conceived of and organized the fraud scheme years *before* Chi ever began working at A Star. As described above, Chi admitted to becoming aware of certain aspects of the fraud scheme—including that Chen benefitted

11

financially from her dual-role at A Star and Clinic-1—and he carried out requests of Chen, Hon, and Zhu, such as conducting research or passing fraudulent payments to conspirators. But all this conduct, while criminal in nature, is "downstream" from the organizers and leaders; Chi was in the position of taking direction rather than giving it.

*As to the third factor—the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority*—Chi lacked decision-making authority regarding the conduct at issue. Rather, Chen, Hon, and Zhu were responsible for running the fraud scheme they established, and they accordingly tasked Chi with various consulting assignments. They then used information Chi provided to make decisions about how to further the fraud scheme. The Government notes that Chi was included in WeChat groups with A Star's owners that were named "bosses" and "Pharmacy management." Addendum to the PSR at 2. But adding Chi to the "bosses" chat does not mean that he was an actual "boss." It means that the bosses wanted him in the chat group so that he could give him information they needed for the scheme. Indeed, Chi was far from integrated with his supervisors at A Star; it is revealing that even by 2021 when Chi sat with the government for a proffer session, the government's notes reflect that he did not know the full names of his alleged co-conspirators, who he referred to only as "Maggie" (LNU), "Amanda" (LNU), and "Zhu" (FNU).

*As to the fourth factor—the nature and extent of the defendant's participation in the commission of criminal activity*—Chi's role in the offense and the acts he personally performed are relatively limited. In contrast to his conspirators, Chi did not: supervise or run A Star's pharmacy; procure or dispense prescriptions on behalf of A Star; directly interact with or provide bribes to customers of A Star; directly pay/accept/solicit bribes in connection with the physician referral kickback scheme; or create fake checks or invoices to cover up the fraud. Nor did he have

any involvement whatsoever with AC Pharmacy, the other half of the fraud scheme. *Cf. United States v. Franklin*, 902 F.2d 501, 510 (7th Cir. 1990) (applying a minor role adjustment in sentencing for money laundering where the defendant "converted drug proceeds from cash to cashier's checks and back to try to disguise the source of payments" among other things).

Again, while some of these factual distinctions are nuanced, they put Chi's conduct in its proper context. In its response to our objections to the PSR, "[t]he Government . . . states that it is incorrect to tie the defendant's culpability to what he physically did, rather than what he agreed to have happen as part of the conspiracy." Addendum to PSR at 4. While that may be true as a matter of conspiracy law, it does not properly parse the facts to assess relative culpability and to fairly sentence individual members of the conspiracy. And it disregards the specific factual questions the Sentencing Commission directs the Court to answer in determining whether a mitigating role adjustment applies. Indeed, contrary to the government's argument, the fair consideration of Chi's actual conduct and role are *directly relevant* to the application of the mitigating role adjustment and to the broader sentencing determination under § 3553(a). *See* Addendum to PSR at 3 ("Moreover, the Government stated whether the defendant agreed to join an existing scheme or whether he was involved in its origination is irrelevant to his culpability.").

Relatedly, we respectfully note our objection to the following language from the government that was incorporated into the Addendum to the PSR and which contains additional factual inaccuracies relating to Chi's role:

> [T]he defendant's role in the conspiracy was significant, lasting over four years, and his involvement was critical to the scheme's success. The defendant, who was a pharmacist for nearly a decade, used his experience and specialized knowledge to review pharmaceutical pricing information, to determine the most lucrative drugs for reimbursement and provided that information to his co-conspirators.

13

Addendum to PSR at 5-6. This is incorrect and overstates Chi's professional experience and his role at A Star. Chi's participation in the fraud scheme lasted approximately three years, not more than four. *See* Indictment ¶ 16, ECF #1 (charging Chi with participation in the fraud scheme from December 2017 through January 2021). Nor had Chi been a pharmacist "for nearly a decade" at the time he worked at A Star. Chi only became a licensed pharmacist in 2015 (at the age of 25), and he began working at A Star in December 2017. Thus, he was early in his career and very inexperienced at the time he was introduced to Chen, Hon, and Zhu.

As to the fifth factor—*the degree to which the defendant stood to benefit from the criminal activity*—Chi did not benefit substantially from the fraud scheme. Unlike Chen, Hon, and Zhu, he did not have any ownership interest in A Star (and so did not have an equity interest in any increased profits generated by the criminal activity). His total compensation over three years was $338,235.27, or approximately $112,745.09 per year, which is well below the average annual compensation for a pharmacist in New York State. In addition, his total financial takeaway from the scheme was a mere fraction of the total loss number of $1,352,941.07 attributed to him under the plea agreement. Indeed, Chi's total financial benefit is approximately one-fourth of the total loss amount attributed to him. Thus, consistent with the Application Note, he is "a defendant who is accountable . . . for a loss amount . . . that greatly exceeds [his] personal gain" from the offense. *See* U.S.S.G. § 3B1.2, cmt. 3(A). Notably, the loss amount attributable to Chi is also a fraction of the total loss associated with the broader scheme perpetrated by Chi's conspirators. *See* PSR ¶ 43 (showing loss amounts for other defendants in amounts ranging between nearly $1.9 million and nearly $11.3 million). Notably, Chen personally pocketed over $1,500,000 from the fraud scheme. *See U.S. v. Jian Ai Chen*, Crim. No. 23-255, ECF # 25 at 4.

14

In response, the government stresses that Chi "thought he would be paid the same amount as the owners" at the time of his hiring, which makes him akin to an owner. Addendum to PSR at 4 (internal quotations omitted). But the fact of the matter is that Chi was not paid the same as the owners; he was paid less than a typical pharmacist. And any belief he held that the owners might pay him as though he were more than a consultant—despite them never actually doing so—reflects one of the many ways the more culpable senior members of this conspiracy duped and used Chi. In fact, there is no evidence that Chi expected a future share in profits generated by the criminal conduct in this case. To the contrary, he voluntarily left A Star in 2021 to attend medical school, without any discussion of equity, bonuses, or other compensation related to his participation in the conduct at issue here. Thus, this factor also weighs in favor of applying the minor role adjustment to distinguish between Chi's culpability and that of his employers. *See United States v. Perez*, 321 F. Supp. 2d 574, 585–86 (S.D.N.Y. 2003) (granting minor role adjustment where "the essential issue facing the Court, which is the appropriateness of treating [the defendant] at the same level of culpability as someone like . . . his employer"). !!

Accordingly, all five of the factors identified by the Sentencing Commission weigh in favor of applying the mitigating role adjustment here. Beyond that, the illustrative examples provided by the Commission reflect that a minor role reduction is appropriate on several bases. Chi is a defendant with a "loss amount . . . that greatly exceeds the defendant's personal gain from a fraud offense." U.S.S.G. § 3B1.2, cmt. 3(A). And while the test is disjunctive, he also qualifies under the provision that he "had limited knowledge of the scope of the scheme," as discussed above. *Id.* Chi also matches the description of "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain acts." U.S.S.G. § 3B1.2, cmt. 3(C).

The government's view is that "a mitigating adjustment is not warranted here because the defendant's role was integral to the conspiracy, and he was more active than a nominee owner." Addendum to PSR at 6. As a factual matter, we disagree that Chi's participation was essential to the criminal conduct in this case, which began before he joined A Star, and continued after he left in 2021. Regardless, the Application Note makes clear that the nominee owner fact pattern is merely one qualifying example, and in addition, that "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative." U.S.S.G. § 3B1.2, cmt. 3(C). Rather, "[s]uch a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." *Id.*

We also respectfully disagree with Probation's determination that Chi is "not considered less culpable than the average participant." Addendum to PSR at 7. Instead of comparing Chi to his conspirators, Probation's analysis uses an imagined "average participant." *See id.* ("With respect to the false claims, an average participant is considered an individual who assists with false and fraudulent claims[.]"). This is not the correct analysis. *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 88 n.16 (2d Cir. 2018) ("Amendment 794 clarified that . . . the 'average participant' specifically refers to the defendant's 'co-participants in the case at hand.'" (quoting U.S.S.G. § 3B1.2 cmt. 3(C)). When viewed under this proper framework, Chi is substantially less culpable than his co-participants who established and carried out a longer, more sophisticated, and more personally profitable fraud.[5]

---

[5] Even if Your Honor disagrees that the mitigating role adjustment applies here, it is central to Chi's sentencing that we distinguish and clarify his role from his conspirators and that there is no misimpression as to the acts he did and did not commit, as these nuances also impact our argument under the 3553(a) factors below.

**II.      There are No Applicable Sentencing Departures at Step Two of the Analysis.**

Consistent with the parties' plea agreement, neither Chi nor the government seek any sentencing departures. We note that in the PSR, Probation mentioned the potential for upward departures on two occasions. *See* PSR ¶¶ 22, 47. For the reasons set forth at length above, we disagree that any upward sentencing departures are warranted. *See infra* at section I.B.

**III.     Consideration of the § 3553(a) Factors Favors a Further Downward Variance.**

In the final step of the sentencing analysis, the Court must consider all factors set forth in 18 U.S.C. § 3553(a) to establish whether a variance is warranted. *See, e.g., Fernandez*, 443 F.3d at 26. In fashioning an appropriate sentence, the Court "shall impose a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing[.]" *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citing 18 U.S.C. § 3553(a)). Most importantly, the sentencing judge shall consider the specific facts of the case in determining the appropriate sentence, and the guidelines "direct[] the judge to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59. Thus, the Court treats the guidelines as a starting point and a factor in the ultimate sentence imposed and may exercise discretion and impose a lesser sentence when it determines "a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *United States v. Shy*, 538 F.3d 933, 937 (8th Cir. 2008) (quoting *Kimbrough*, 552 U.S. at 91); *see also United States v. Park*, 758 F.3d 193, 197 (2d Cir. 2014) (the guidelines range is the "'starting point and the initial benchmark'" in calculating a sentence). "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in

that consideration the judge's own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

Section 3553(a) states that: "The court, in determining the particular sentence to be imposed, shall consider—, (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed . . . ; (3) the kinds of sentences available; (4) [the guidelines range]; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." A court should impose a sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Park*, 758 F.3d at 197. In determining the appropriate sentence, the court may consider anything about the defendant's conduct or background, unless expressly prohibited. *See Pepper v. United States*, 562 U.S. 476, 488 (2011). Although sentencing courts must calculate the guidelines range, they should not "presume that the Guidelines range is reasonable," but instead "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. The Court must be guided always by the § 3553 factors to fashion the appropriate sentence.

In this case, many of the same facts and context discussed above that favor a mitigating role adjustment also strongly weigh in favor of a further downward variance under § 3553(a): Chi's unique personal circumstances, including his challenging upbringing in China and his journey to integrate and establish himself in the United States as a young man; his prioritization

18

of others above himself, exemplified in his dedication to his family members and community both near and far and his pursuit of a career that would allow him to give back to those in need; his relatively limited role in (and limited benefit from) the criminal conduct at issue; the role his youth and naivete played in his entanglement in the offense conduct; the lack of any need for specific deterrence given the extensive impacts Chi his already experienced as a result of his conviction and potential loss of future livelihood and beloved profession. All of these factors, independently and combined, support a substantial downward variance pursuant to § 3553(a) and are consistent with a sentence of probation or home confinement.

### A.    Chi's History and Characteristics Warrant a Downward Variance.

Under § 3553(a)(1), the Court shall consider the history and characteristics of the defendant. This is a critical part of the Court's task at sentencing to evaluate the whole of the individual, making "an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. The facts presented here reflect a person who faced hardship during his upbringing in China, but despite these obstacles, persevered and immigrated to the United States to pursue a career in healthcare with the goal of helping those in need. While attempting to launch his career as a pharmacist, he trusted the wrong people and made mistakes that led to his involvement in this case. But his error in judgment does not reflect Chi's true character, which is instead defined by a deep empathy for others and a commitment to both his family and the broader community.

> ### i.    *Chi's Upbringing, Immigration to the U.S., and Dream of Becoming a Pharmacist*

Chi grew up in Hong Kong, China under "modest circumstances . . . where the landscape of opportunity was starkly limited."[6] He was raised primarily by his mother, and together with his younger sister, the family was of lower income status. PSR ¶ 77. They lived in a small apartment

---

[6] Letter of Eric Liang, Exhibit C.

of approximately 300 to 400 square feet. *Id.* Chi's father was largely absent from his childhood. *Id.* His father owned a factory that was hours away from the family home, and he lived near the factory. *Id.* As a result, Chi saw his father only one or two times each year. *Id.* Chi's father provided financial support to the family, but it was not enough to cover expenses, and Chi's mother "did anything she could" to earn money and provide for her children. *Id.* When Chi's father visited, he drank heavily and would get into verbal fights with Chi's mother; these fights sometimes became physical, as Chi's parents threw things at one another. *Id.* When he was growing up, Chi did not realize that it was abnormal for his father to live apart from the family, and he only came to realize as an adult that he had "grown up without a father." *Id.* Chi's paternal grandfather acted as more of a "father figure" to him, though they only spent a few weeks together each year. *Id.*

Despite the challenges of his childhood, Chi "harbored ambitions that far exceeded the confines of his environment."[7] Chi was motivated to attend college in the United States, a country he admired "for its freedom, opportunities, and innovation."[8] In 2007, Chi immigrated to the United States on a student visa, and in 2020 he proudly became a naturalized U.S. citizen. PSR ¶ 81. As Chi's cousin described, Chi always dreamed of "becoming a pharmacist, a profession marked by its service to humanity."[9] And it was Chi's "dream that catalyzed [the] family's journey to the United States."[10] In 2018, Chi's parents followed his path and immigrated to the United States. PSR ¶ 75. The family's integration into the United States was not easy. Chi's parents have had difficulty finding work due to an inability to speak English fluently. *Id.* Chi's father is unemployed, and his mother works delivering various retail items to customers. *Id.* As a result, Chi has been supporting his parents financially. *Id.*

---

[7] *Id.*
[8] Letter of Yin Chau Lam, Exhibit B.
[9] *Id.*
[10] *Id.*

When Chi graduated from the University of Charleston School of Pharmacy with a Doctor of Pharmacy degree in 2015, he was concerned about finding his place in his new profession and obtaining work. PSR ¶ 94. Obtaining his degree was an accomplishment that Chi worked tremendously hard for, and "his entire family and friends were very proud of him,"[11] but Chi quickly shifted his focus to putting his skills to use. It was at this juncture, as a young man early in his career, that Chi became connected with some of the defendants in this case. As his sister described, at the time of Chi's graduation from pharmacy school, Chi was "too young and sometimes too naïve":

> Right after his graduation from pharmacy school at the age of 25, he began working in the Asian community, where he thought he might be able to help the elderly and new immigrants with language barriers. But he ended up knowing the wrong people, being under the wrong influence, and going to the wrong place at the wrong time.[12]

Specifically, in 2017, one of Chi's distant family members—the sister of Chi's sister's husband—introduced him to someone named "Maggie" (Jian Chen), "Amanda" (Amanda Hon), and "Zhu" (Si Ci Zhu). The purpose of the introduction was to meet people in the industry, particularly within the Asian-American community. Maggie Chen offered Chi a job at A Star, where she was an owner, and Wong accepted, thrilled to have the chance to gain more experience as a pharmacist and to connect with people he believed were like him. Unfortunately, Chi made the catastrophic mistake of placing his trust in the wrong people and became involved in a criminal conspiracy that his new acquaintances had been operating for years.

---

[11] Letter of Yin Chau Lam, Exhibit B.
[12] Letter of Pui Wong, Exhibit A.

ii.     *Chi's Character and Devotion to Helping Others*

Chi's lack of skepticism toward others is rooted in his character: because he always puts other people first, it is inconceivable to him that someone else may not possess the same integrity. And Chi has always been this way; since he was a young child, he was known in the family for his "gentle disposition" and "moral fortitude."[13] As his mother put it, Chi has "always been frugal with himself but generous with others."[14] As a young boy he took it upon himself to complete various good deeds—for example, donating "small amounts of money from his piggy bank" to the homeless and organizing a donation drive after a major flood.[15] He was known for being "always generous with his possessions at school" and was "unforgettable" for his "sincerity and earnestness."[16] Indeed it was Chi's compassion and selflessness that drove him to become a pharmacist, and then later to pursue medical school, which he had begun attending but has since terminated as a result of this criminal case. As his cousin described, Chi's chosen career path "is a testament not only to his personal dedication but to a deeply ingrained ethos of providing for those beyond oneself."[17]

Chi's nature is perhaps most evident in his devotion to his family. Those close to him describe him as a "pillar of strength"[18] and a "protector and caregiver"[19] for the family, "[d]espite his young age." [20] It is thus no surprise that Chi's family "cherishes him deeply."[21] As Chi's sister described:

> I recall a time when our grandfather suffered a fall and developed a
> stroke, rendering him unable to walk.  As the only grandson of the

---

[13] Letter of Eric Liang, Exhibit C.
[14] Letter of Yin Chau Lam, Exhibit B.
[15] *Id.*
[16] *Id.*
[17] Letter of Eric Liang, Exhibit C.
[18] Letter of Yvonee Sartzetaki, Exhibit D.
[19] Letter of Wong Shui Hai, Exhibit E.
[20] Letter of Lin HuiXuan, Exhibit F.
[21] Letter of Huang Geng, Exhibit G.

family, Chi is deeply concerned [about] grandfather's age.  Without
hesitation, Chi transferred his work to others with a strong sense of
responsibility and flew to China to care for our grandfather.  He
bathed him, accompanied him to hospital visits, massaged his legs,
and provided companionship daily.  He made immense sacrifices for
our family, but tragically, he couldn't attend our grandfather's
funeral due to his legal obligations, a fact that weighs heavily on
him.[22]

Chi's cousin similarly recalled:

One of the most salient illustrations of Chi Kwan Wong's character
is his voluntary care for our grandparents during a period when
additional support was scarce.  Tasked with the care of a loved one
in the advanced stages of illness—a role that brought with it
challenged of argumentativeness and combativeness—Chi Kwan
Wong's resolve never wavered.  Day after day, he approached this
duty with a heart full of love, emerging with stories that highlight
not the trials but the beauty and strength of the human spirit.  His
capacity to find joy and meaning in even the most trying
circumstances speaks volumes of his exceptional character.[23]

During the pandemic, Chi also took it upon himself to support family near and far in any

way possible.  As his aunt relayed in her letter of support:

In the challenging times of the past few years, particularly during
the COVID-19 pandemic, he has been constantly attentive to the
health of the elderly in our family, providing meticulous care to our
older relatives.  The health and wellbeing of each senior, including
myself, far away in China, has always deeply affected him.  He
regular phone calls, advice on maintaining health, and reminders on
how to prevent the spread of the coronavirus are testament to his
responsibility and love.[24]

Chi's generosity of spirit extends to the broader community. As his sister recounted, this

has been a consistent theme throughout Chi's life:

During his junior high school years, he walked over three miles each
day to save the transportation allowance from the family, but he
donated his savings to the homeless and contributed to disaster relief
efforts.  Additionally, he dedicated his time to volunteering at local

---

[22] Letter of Pui Wong, Exhibit A.
[23] Letter of Eric Liang, Exhibit C.
[24] Letter of Lin HuiXuan, Exhibit F.

charities. Especially amidst the challenges exacerbated by the COVID-19 pandemic, Chi's dedication to supporting vulnerable members of society has been remarkable. He organized donation drives, distributed essential medical supplies, and tirelessly served the community. His efforts included gathering medical equipment like face masks, OTC medications, sanitary solutions and donating them to hospitals such as Maimonidies Hospital, Midwood Community Hospital, NYC Health + Hospitals, and Elmhurst Hospital.[25]

As Chi explained to his sister, he felt that "just like soldiers … [a]s a healthcare professional, he must always stand up for society when the community needs him.[26] Chi was also "touched by the sacrifices the young people made" during the 2019 Umbrella Movement in Hong Kong and donated medical supplies and other items to support the demonstrators. Chi values the freedom and democracy available to him in the United States and "realized how important it is to preserve it and promote it elsewhere when he sees the opportunity."[27]

Local leaders within Chi's Brooklyn neighborhood similarly know him as "a pillar of strength and support within our community, always ready to lend a helping hand to those in need."[28] Wai Yee Chan is the Executive Director of Homecrest Community Services Inc., a non-profit that serves the needs of immigrant families and disadvantaged people in Southern Brooklyn. In this role, he has observed "Chi's unwavering commitment to helping others firsthand," including by "providing medical education as well as translation services free of charge to people that need it most."[29] He continued:

Chi has been a volunteer serving [the] Brooklyn community in the past, dedicating his time and efforts to various initiatives aimed at supporting older adults, youth and immigrant families. His passion for community service is truly inspiring, and his impact on the lives of those around him is immeasurable . . . Chi embodies the values

---

[25] Letter of Pui Wong, Exhibit A.
[26] *Id.*
[27] *Id.*
[28] Letter of Wai Yee Chan, Exhibit H.
[29] *Id.*

of compassion, generosity, and selflessness that are at the core of our organization's mission granting generous donations to multiple organizations including hospitals in the Brooklyn area during Covid-19.[30]

Ricky Ki, leader of the Salvation Army for Bensonhurst, also described Chi's commitment to the community in his letter of support. He wrote:

I first met Chi back in 2018-2019, prior to the challenges brought on by the COVID-19 pandemic. His commitment to serving others through volunteer work at our community center has left a lasting impression on both myself and those he has interacted with. He dedicated his time to educating our community on matters of healthcare and medication. His willingness to share his expertise and answer questions regarding health-related issues benefited the senior community. Throughout our interactions, I have found Chi to be not only knowledgeable and dedicated but also compassionate and empathetic.[31]

In short, Chi is "a man whose contributions and fundamental goodness far outweigh the mistakes he made."[32] Chi "is still young, with a lot of life ahead of him, and he has the potential to make significant contributions to society."[33] We ask that he be allowed "a chance to return to the community and pay back using his knowledge and good heart."[34]

Indeed, a term of incarceration would be counterproductive not only to Chi, but to the community as well, impacting innocent third parties who would suffer the "collateral effects" of his sentence. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (recognizing that "calibrat[ing]a 'just punishment'" requires consideration of the "collateral effects of a particular sentence"). Here, Chi's inherent kindness, perseverance despite obstacles, and commitment to others weigh in favor of a variance to a non-custodial sentence.

---

[30] *Id.*
[31] Letter of Ricky K, Exhibit I.
[32] Letter of Eric Liang, Exhibit C.
[33] Letter of Huang Geng, Exhibit G.
[34] Letter of Yin Chau Lam, Exhibit B.

**B.**     **The Nature and Circumstances of the Offense Justify a Downward Variance.**

Section 3553(a)(1) requires the Court to consider the nature and circumstances of the offense in determining a sentence to be imposed. We respectfully submit that the nature and circumstances here warrant a downward variance separate from and in addition to a mitigating role adjustment.

In order to avoid unnecessary repetition, we will not repeat all of the mitigating factors discussed above here. However, as set forth in detail above, *see infra* at sections I.A. - I.B, suffice it to say that Chi's role in the conspiracy was limited in many important ways. It is worth reiterating that he was not an organizer, not an overseer, and not even much of a "do-er" when it came to carrying out the central acts of the conspiracy. He was a part-time fringe player who, though knowing and willful, performed some tasks relevant to the scheme at the direction of others and without the same economic benefit. He is essentially accused of (and has admitted to) looking the other way regarding certain illegal conduct, with which he was either not involved or tangentially involved, including the customer "loyalty" scheme, Chen's conflicting employment with a prescribing physician and her financial ties to A Star, and passing illegitimate checks for cash. He was unaware of the most egregious conduct involving kickbacks to doctors, which others in the scheme carried out. And he was there only part of the time. Chi began working with A Star long after other charged individuals, left of his own accord while A Star was still operating, and was not involved at all with Chen's second pharmacy.

While Chi's role does not limit his legal accountability for his actions, which he fully accepts, it does limit his culpability and role, critical factors under § 3553(a). When viewed in the context of this broad and long-running conspiracy charged in this case, Chi's actions are deserving of leniency.

C.    **Incarceration Is Not Necessary for Deterrence, Societal Protection, or Rehabilitation.**

Section 3553(a)(2) instructs courts to consider the need for the sentence imposed to: (A) "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense;" (B) "afford adequate deterrence to criminal conduct;" (C) "protect the public from further crimes of the defendant;" and (D) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." A sentence of probation or home confinement would satisfy all of these considerations and provide a sentence that is sufficient but not greater than necessary to achieve these important sentencing goals.

Deterrence does not require a custodial sentence in this case. *First*, there is simply no need to specifically deter Chi from future criminal conduct. He has no prior criminal history, and he is not criminogenic by nature. In fact, unlike other defendants who initiated and orchestrated the fraud for nearly a decade, Chi stopped working at A Star Pharmacy in 2021 to attend medical school *before* ever learning of the criminal investigation. Moreover, he has always demonstrated the highest degree of concern for his family, friends, colleagues, and strangers alike, as the many character letters submitted on his behalf detail. He has a loving network of family and friends who believe in him and his ability to contribute positively to the world despite this criminal conviction. The risk of him reoffending and disappointing his supporters is non-existent.

Also, Chi has already suffered greatly as a result of this case. He has lost his reputation in his community, his career as a pharmacist, and his aspirations of becoming a medical doctor. He faces significant financial penalties that far exceed his personal gain from the criminal activity. And he has lost his primary means of earning money. He has also suffered emotionally through the shame this case has brought upon his family and his inability to support his family as he had

27

in the past; in particular, his inability to attend his grandfather's funeral due this case has caused Chi great distress.[35] It is thus no surprise that he now suffers from increased mental health symptoms following this case, including anxiety, depression, insomnia, and has been diagnosed with adjustment disorder with mixed anxiety and depressed mood. PSR ¶¶ 85-86.

*Second*, the personal damage suffered by Chi as a result of this case also provides for general deterrence. The public nature of Chi's arrest, charge, criminal conviction, and loss of career and future earning capacity offers a serious warning to other individuals who may commit healthcare crimes. The significance of such federal charges is clear to any onlooker without the need for custodial detention.[36]

The sentencing goal of rehabilitation also supports a sentence that does not include incarceration. While a court must consider a defendant's need for rehabilitation, a court "may not carry out that goal by *imprisonment*." *United States v. Manzella*, 475 F.3d 152, 158 (3d Cir. 2007) (emphasis in original) (citing 18 U.S.C. § 3582(a)). Indeed, both courts and the U.S. Sentencing Commission have recognized that non-custodial sentences offer rehabilitative potential. *See United States v. Collado*, No. 07 CR. 1144 (HB), 2008 WL 2329275, at *6 (S.D.N.Y.

---

[35] Letter of Pui Wong, Exhibit A.

[36] Relying on "a large body of research," the National Institute of Justice—which serves as the DOJ's research, development and evaluation agency—concluded that the imposition of a sentence of imprisonment does not generally deter criminal conduct. *See* National Institute of Justice, *Five Things About Deterrence*, U.S. Dep't of Justice Off. of Justice Programs, May 2016, https://www.ojp.gov/pdffiles1/nij/247350.pdf (finding, inter alia, that (1) "The certainty of being caught is a vastly more powerful deterrent than the punishment"; (2) "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime"; and (3) "Increasing the severity of punishment does little to deter crime."). *See also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201-02 (2013) ("Thus, I conclude, as have many prior reviews of deterrence research, that evidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment. . . . [I]t is clear that lengthy prison sentences cannot be justified on a deterrence-based, crime prevention basis."). With respect to white-collar crime in particular, the evidence reflects that there is no difference in the deterrent effect between a custodial and non-custodial sentence. *See* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448–49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

June 5, 2008) (noting that supervised release "is both rehabilitative and punitive"); U.S.S.G. Ch.5, Pt.B, intro. comment.

Moreover, Chi is not in need of training or rehabilitative services offered by the Bureau of Prisons. He is educated, self-sufficient, and has a family who loves and supports him. During the pendency of this case, Chi has endeavored to chart a new path forward. He went back to school part-time for data analysis and he has launched an e-commerce business. He has even developed his own food flavoring product – called "Chi Ramen" – which has begun selling on e-commerce platforms. He works at his newly-launched business six days per week. Chi also recently got married. And notably, it has been over three years since his first encounters with law enforcement in this case. Not only would a non-custodial sentence adequately promote correction and rehabilitation, it would also avoid derailing Chi's progress that he has made post-arrest. See, e.g., *United States v. Zimmerman*, No. 10-CR-598 JG, 2012 WL 3779387, at *7 (E.D.N.Y. June 19, 2012) (an individual's rehabilitation *prior to sentencing* is "highly relevant to several of the [3553] factors a sentencing court is required to consider when imposing sentence.")

It is noteworthy that Chi has gone to great lengths to show his remorse and desire to repay society for his crimes. Chi's plea agreement includes an agreement to pay a forfeiture money judgment in the amount of $338,235.27, which constitutes Chi's salary, including cash bonuses and other compensation, during the duration of the charged scheme. Since his decision to plead guilty, Chi has been nearly singularly focused on obtaining these funds to pay the entirety of his forfeiture judgment before his sentencing hearing. To be clear, Chi does not independently have the financial means to afford such a large sum. But over the course of the past several months, Chi has borrowed from loved ones and friends to cobble together enough money to satisfy his financial obligations in the forfeiture money judgment and as of this writing, Chi will be able to pay the

29

judgment in full at or before his sentencing. His desire to pay back the entirety of his forfeiture judgment though not being a person of substantial financial means, all while knowing that he may face years of incarceration, is nothing short of remarkable and places him in the diminishingly small minority of defendants. Satisfying his financial obligations under the plea agreement before sentencing is powerful evidence that Chi understands the gravity of his mistakes, has committed to avoiding any such mistakes in the future, and is prepared now to be a productive member of society without a punitive term of incarceration.

Indeed, a sentence of imprisonment for Chi would serve none of the § 3553(a) aims other than punishment. To the contrary, punishment by way of incarceration is both unnecessary and counterproductive here. Imposition of a non-custodial term would not mean that Chi is escaping punishment at sentencing. A term of home confinement is punitive because it places serious limitations on the defendant's freedom. *See U.S. Probation and Pretrial Services*, "Home Confinement," available at        https://www.nyspt.uscourts.gov/forms/Home_Confinement.pdf (stating that home confinement is used "as a punishment," albeit one that costs much less than incarceration and enables individuals "to support [] their families and pay taxes"). Indeed, courts have recognized that even probation is punitive as it "substantially restricts [a defendant's] liberty" particularly when paired with home confinement and community service. *Gall*, 552 U.S. at 48; s*ee also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.") (citation omitted); *United States v. Tolla*, 781 F.2d 29, 35 (2d Cir. 1986) ("[P]robation itself contains elements of punishment in the restraints imposed upon the freedom of the individual[.]"). An alternative sentence in this case is the fair and just level of punishment for Chi taking into account all of the § 3553(a) factors.

**D.**     **A Significant Downward Variance Would Avoid Unwarranted Sentencing Disparities.**

A sentencing court must also consider the need to avoid unwarranted sentencing disparities before imposing a sentence. 18 U.S.C. § 3553(a)(6). A Guidelines sentence here would create an unwarranted sentencing disparity as compared to the below-Guidelines variance received by the first of the six co-defendants to be sentenced in this matter, Chen, who received a sentence of 30 months' imprisonment. *See U.S. v. Chen*, Crim. No. 23-255, ECF # 26. Indeed, Probation recommended an even lower sentence for Chen, 28 months, a significant variance below her guidelines range of 51-63 months. Yet confusingly, Probation has recommended a higher sentence for Chi than for Chen, with a recommendation of 30 months. *See* Sentencing Recommendation, dated April 5, 2024.

Respectfully, the discrepancy in these sentencing recommendations highlights the importance of our objections to the PSR and the need for factual clarity in the record. To be clear, Chen was the unequivocal ringleader of this conspiracy, with Hon and Zhu in close pursuit. She had an interest in both sides of the equation—at the pharmacy and at a referring physician's office—so she both paid and personally received kickbacks. She is assigned a loss number of over $11 million to account for her decade-long fraud in which she used two separate pharmacies. And she personally profited from the scheme to the tune of $1,500,000, more than five times the total amount Chi was paid. Even understanding that Chen's recommendation fell below her guidelines due to personal hardship, it is challenging to reconcile a scenario in which a minor player receives a greater sentence that the conspiracy's leader and greatest beneficiary. To avoid an unfair sentencing discrepancy in this case, the Court should afford Chi a similarly substantial downward variance in sentencing.

31

## CONCLUSION

Based on all of the foregoing—including Chi's background and personal characteristics, the nature and circumstances of the offense, including his limited role in and benefit from the conspiracy, the positive impact he has had on society and the likelihood that he will continue to improve the lives of others in the future—Chi respectfully requests leniency in the imposition of his sentence. We respectfully request that the Court impose a sentence of probation or home confinement followed by a period of supervised release.

Respectfully submitted,

ABELL ESKEW LANDAU LLP

By:   /s/David M. Eskew
David M. Eskew
256 Fifth Avenue, 5th Floor
New York, NY 10001

32