|  |  |
|---|---|
| JPL/TJT:MGD<br>F. #2021R00827 | **U.S. Department of Justice**<br><br>*United States Attorney*<br>*Eastern District of New York*<br><br>*271 Cadman Plaza East*<br>*Brooklyn, New York 11201* |

October 8, 2024

By ECF

The Honorable Hector Gonzalez
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re: United States v. Chi Kwan "Ken" Wong
        Criminal Docket No. 23-88 (HG)

Dear Judge Gonzalez:

    The government respectfully submits this letter in anticipation of sentencing in the above-referenced case, currently scheduled for October 16, 2024 at 2:00 p.m. and in response to the sentencing memorandum filed by the defendant Chi Kwan "Ken" Wong (the "defendant" or "Wong"), dated July 30, 2024 ("Def. Mem.").

    According to the pre-sentence investigation report filed on April 5, 2024 (the "PSR") and the Addendum to the PSR filed on July 12, 2004 (the "Addendum"), the defendant's total offense level under the United States Sentencing Guidelines (the "Guidelines") is level 19 and his Criminal History Category is I, which yields an applicable Guidelines range of imprisonment of 30 to 37 months. (See PSR at ¶¶ 67, 114).

    The government respectfully requests that the Court impose a sentence within the Guidelines range. A sentence of imprisonment between 30 to 37 months would accomplish the goals of Title 18, United States Code, Section 3553(a) ("Section 3553(a)").

  I. The Offense Conduct

    Between December 2017 and January 2021, Wong, together with co-conspirators including Amanda Hon, Si Ci Zhu and Jian Ai "Maggie" Chen,[1] carried out a fraudulent scheme at AC Pharmacy ("AC") and A Star Pharmacy ("A Star" and, together, the "Scheme

---

[1] Hon (22-CR-60), Zhu (22-CR-14) and Chen (23-CR-255), as well as others such as John Yiu (23-CR-89), have pleaded guilty before Your Honor to their roles in the conspiracy. Chen was sentenced on July 17, 2024, to 30 months' imprisonment. United States v. Chen, 23-CR-255, Docket No. 26.

Pharmacies") whereby claims were submitted to Medicare and Medicaid for prescription drugs that were procured by the payments of bribes and kickbacks, not medically necessary, and not actually dispensed to beneficiaries. (PSR ¶ 25.)

In particular, Hon, Chen and Zhu, as well as other co-conspirators, agreed to pay, and caused to be paid, illegal bribes and kickbacks to individuals associated with a medical clinic referred to in the indictment as Clinic-1, in exchange for the referral of Clinic-1 patients to the Scheme Pharmacies. (PSR ¶ 26.) Chen was employed as a medical assistant at Clinic-1 and was instrumental in arranging the kickback relationships, including with Yiu, a physician at Clinic-1. Yiu wrote prescriptions absent medical necessity, including expensive medications such as diclofenac epolamine (which he had generally not prescribed prior to beginning to accept kickbacks from Chen and his co-conspirators), to patients who then brought their prescriptions to AC. (PSR ¶ 30.)

Additionally, Hon and Chen, as well as other co-conspirators, paid bribes and kickbacks to patients so that they would bring their prescriptions to be filled at the Scheme Pharmacies, including but not limited to diclofenac epolamine prescribed by physicians at Clinic-1, and so that the Scheme Pharmacies could take for themselves the value of patients' Medicare over-the-counter ("OTC") benefits.[2] The bribes typically took the form of cash-equivalent supermarket coupons. (PSR ¶ 36.) Between January 2012 and January 2021, the Scheme Pharmacies paid approximately $5 million for gift certificates to supermarkets near the Scheme Pharmacies. (PSR ¶ 38.)

In approximately 2017, the scheme established at AC expanded to the newly-established A Star, where Chen also received bribes in exchange for patient referrals. At A Star, Wong provided information regarding highly profitable prescription drugs to Chen, as well as Hon and others, which Chen used to obtain prescriptions from Clinic-1. The lucrative medications Wong identified included, in early 2019, diclofenac epolamine, which Yiu began prescribing several months later when he joined the conspiracy. (Wong Sentencing Tr. at 23; PSR ¶ 31.) Some, if not all, of the prescriptions Wong assisted in procuring were medically unnecessary and were prescribed in exchange for kickbacks and bribes. (PSR ¶ 47; PSR Addendum at 3.) A Star then billed beneficiaries' and recipients' insurance plans for dispensing those medications without regard to medical necessity. (PSR ¶ 32.)

Between January 2010 and January 2021, AC received approximately $75 million in reimbursement for claims from Medicare and Medicaid. Between September 2016 and January 2021, A Star received approximately $26 million in reimbursement for claims from Medicare and Medicaid. Of those claims, at least $11 million worth were for pharmaceuticals that were not dispensed at all. (PSR ¶ 34.)

---

[2] Certain Medicare plans provided their beneficiaries with debit cards (the "OTC Cards") containing funds that were to be used for the purpose of purchasing certain designated OTC items, such as painkillers and first aid materials. The balances on the OTC Cards were renewed on a monthly basis. (PSR ¶ 10.)

Wong and Zhu additionally laundered money for their co-conspirators. Among other things, Wong conspired with Zhu to write checks to third parties who provided cash in exchange. That cash was used to pay Wong and his co-conspirators their portion of the proceeds, as well as to pay kickbacks and bribes. (See PSR ¶¶ 40-41.)

For his participation in the conspiracy, including but not limited to identifying lucrative drugs for which his co-conspirators unlawfully obtained prescriptions, facilitating the payment and receipt of health care kickbacks, and laundering money, Wong was paid approximately $338,235.27 in fraudulent proceeds. (Plea Agreement ¶ 6.)

II. Procedural Background

On February 28, 2023, the defendant was indicted on charges of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count One), and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (See PSR ¶ 46; Indictment ¶ 27, Docket Entry 1.) On January 8, 2024, the defendant pleaded guilty to Count One of the indictment. (PSR ¶ 1.)

III. The Sentencing Guidelines

1. The PSR's Guidelines Calculation

The Guidelines calculation set forth in paragraphs 57 through 67 of the PSR, as modified by the Addendum, and as set forth in the parties' plea agreement, is as follows:

| | |
|---|---|
| Base Offense Level (§ 2B1.1) | 6 |
| Plus: Loss more than $550,000 (§ 2B1.1(b)(1)(H)) | +14 |
| Plus: Federal health care offense with loss over $1,000,000 (§ 2B1.1(b)(1)(H)) | +2 |
| Minus: Abuse of a position of trust (§ 3B1.3) | +2 |
| Minus: Zero-point offender (§ 4C1.1) | -2 |
| Total: | 22 |

The base offense level is reduced by three levels pursuant to Guidelines Section 3E1.1 in light of the defendant's acceptance of responsibility and timely plea of guilty, for a total offense level of 19. (PSR ¶¶ 65-66.) Accordingly, based upon a total offense level of 19 and a criminal history category of I, the applicable Guidelines range as calculated in the PSR, as

amended by the Addendum, and as stipulated in the Plea Agreement,[3] is 30 to 37 months' imprisonment. (PSR ¶ 67; Plea Agreement ¶ 2.)

2. Wong's Objections to the PSR

On May 2, 2024, Wong filed a number of objections to the factual background section of the PSR, as well as a request for a two-level mitigating role adjustment under Guidelines Section 3B1.2(b). The government filed its response on May 24, 2024, and the Probation Department rejected Wong's objections in the Addendum.

In his sentencing memorandum, Wong rehashes the same factual objections and request for a mitigating role adjustment that were rejected by the Probation Department. The government respectfully refers the Court to its May 24, 2024 letter in response to Wong's factual objections to the PSR, which is attached hereto as Appendix A, and to the Addendum.

The defendant contends that he is entitled to a two-level reduction under Section 3B1.2 of the Guidelines for having been only a "minor participant" in the "criminal activity." Def. Mem. at 9. The government agrees with the Probation Department that the requested reduction should be denied. (PSR Addendum at 5-7.)

The defendant has the burden of proving by a preponderance of the evidence that he is entitled to a minor role adjustment under Section 3B1.2 of the Guidelines. See United States v. Yu, 285 F.3d 192, 200 (2d Cir. 2002); United States v. Castaño, 234 F.3d 111, 113 (2d Cir. 2000). In determining the defendant's role, the Court should consider "'the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise.'" United States v. Carpenter, 252 F.3d 230, 234 (2d Cir. 2001) (quoting United States v. Shonubi, 998 F.2d 84, 90 (2d Cir. 1993)).

The Guidelines set forth a five-prong test for whether a mitigating role adjustment should be applied. No one factor is dispositive, and the list is "non-exhaustive." U.S.S.G. § 3B1.2, cmt. 3(C). The five factors are as follows: (1) the degree to which the defendant understood the scope and structure of the criminal activity; (2) the degree to which the defendant participated in planning or organizing the criminal activity; (3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (5) the degree to which the defendant stood to benefit from the criminal activity.

Considering the factors set forth in the Guidelines, individually and as a whole, Wong should not receive a minor role adjustment. As to the first and second factor, Wong was well aware of the nature and scope of the conspiracy. By his own admission, he knew that

---

[3] The Plea Agreement contained a carve-out that permitted the defendant to argue that he is entitled to a mitigating role reduction. (Plea Agreement ¶ 2.)

patients came to the pharmacy in exchange for illegal kickbacks and bribes and he knew that the information he provided his co-conspirators regarding lucrative pharmaceuticals resulted in prescriptions for those drugs being sent to the pharmacy. As discussed above, his assertion that he had no idea how his co-conspirators were obtaining those prescriptions is simply not credible. Indeed, as Wong argues, the action of providing pricing information is not in and of itself illegal. What made it illegal was Wong's intent in taking the action. Wong intended, by providing the pricing information, to set in motion a chain of events that would unlawfully procure prescriptions – and therefore profit – for the pharmacy. Wong pleaded guilty to knowingly participating in this conspiracy, and he cannot now claim that he did not know that the information he provided would be used illegally.

As to the third and fourth factors, Wong's role in the conspiracy was significant and sustained, lasting over four years, and his involvement was critical to the scheme's success. Wong, a pharmacist with nearly a decade of experience in the industry, misused that experience and specialized knowledge to review pharmaceutical pricing information, with the purpose of determining the most lucrative drugs for reimbursement and providing that information to his co-conspirators so that they could procure prescriptions for those drugs. Nor was he a minor player who was simply "following orders" from his co-conspirators. Rather, he exercised discretion and authority over the information that he offered to his co-conspirators, flagging for them the drugs that he himself decided would be worth integrating into the scheme. Wong's active, constant and intelligent participation was critical to the success of the scheme. See United States v. Shyne, 388 Fed. Appx. 65 (2d Cir. 2008) (finding defendant did not qualify for a minor role reduction because he had performed "important acts" that were necessary to complete the scheme); United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999) (finding defendant did not qualify for a minor role adjustment because he played an "integral role" in the crime's success); see also U.S.S.G. § 3B1.3, Background (defendants who receive a Guidelines enhancement for abuse of a position of trust or special skill "are generally viewed as more culpable" (emphasis added)).

As to the fifth factor, Wong had a strong proprietary financial interest in the scheme as, among other reasons, his compensation of approximately $113,000 per annum was well above market for a purportedly part-time pharmacist "consultant." See United States Bureau of Labor Statistics, Occupational Employment and Wage Statistics, 29-1051 Pharmacists, available at https://www.bls.gov/oes/2019/may/oes291051.htm (annual mean wage for full-time New York pharmacist in 2019 was $121,480 per annum)

As Wong notes, Def. Mem. at 10, the Guidelines state that "a defendant in a healthcare fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, may receive" a mitigating role adjustment. U.S.S.G. § 2B1.1, Application Note 3(A) (emphasis added). The phrasing of the Guidelines makes clear that, even in the case of a pure nominee owner with no further involvement in the scheme, a mitigating role adjustment is not mandatory. But more importantly, an adjustment is not appropriate where, as here, Wong's role was integral to the conspiracy and he was more active and better compensated than a mere nominee owner. See, e.g., United States v. Nachamie, 121 F. Supp. 2d 285, 295 (S.D.N.Y. 2000) ("While the doctors were certainly less culpable than other participants in the Nachamie scheme, they were not substantially less culpable than the average participant in a Medicare fraud. . . . [T]he scheme

5

could not operate without doctors. They played an absolutely essential role. . . . Given this irreducible role, I cannot conclude that their role in this scheme was either minor or minimal."). The defendant's request for a mitigating role adjustment should be denied.

## IV. A Custodial Sentence Within the Guidelines Range is Appropriate in this Case

The government respectfully requests that the Court impose a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). The nature and circumstances of this case, the history and characteristics of the defendant, the need to promote respect for the law and provide just punishment, the need for specific and general deterrence and the need to avoid sentencing disparities (together, the "3553(a) factors") justify a custodial sentence between 30 to 37 months.

### 1. The Nature and Circumstances of the Offense and Characteristics of the Defendant

A custodial sentence between 30 to 37 months is appropriate considering the nature and circumstances of this offense and the defendant's characteristics.

The defendant was an integral part of this conspiracy to defraud Medicare and Medicaid. The defendant's decision to engage in these crimes was deliberate and calculated, and not a momentary lapse of judgment. It was not a one-time event, and he was no "part time fringe player," Def. Mem. at 26; rather, he supported the extensive scheme wholeheartedly and came up with ways to advance and conceal it. It was his job to provide the information that his co-conspirators needed to carry out the fraud, and it was his job to obtain the cash by which they paid off beneficiaries and other co-conspirators and covered their tracks.

As a licensed pharmacist, the defendant had ample opportunity to build a career in non-criminal ways, and to leverage his license into a source of legitimate income and social good. He nonetheless joined a criminal conspiracy, placing patients and much-needed federal health care dollars at risk and abdicating his self-professed role as a health care "soldier[] who make[s] personal sacrifices and [is] always there for society when the community needs [them]." Def. Mem. at 1 (quotation marks omitted). He knew what he was doing was wrong, and he did it anyway. Ultimately his conduct resulted in a loss to federal health care programs of over $1.3 million.

The defendant had every opportunity to succeed by his own efforts, and he chose instead to proceed down a criminal path. He must now face the consequence of that choice.

### 2. The Seriousness of the Offense, Deterrence and Protecting the Public

The Court's sentence should also reflect the seriousness of the offense, promote respect for the law and further the aims of specific and general deterrence. 18 U.S.C. § 3553(a)(2)(B), (C).

The sentence imposed must take into account the need for specific deterrence in order to prevent the defendant from reoffending in this or another manner. The defendant's efforts to downplay his involvement in the scheme and the importance of his conduct further illustrates the need for individual deterrence. The defendant throughout his guilty plea and

6

sentencing process has minimized his role, claiming that he was simply in the "wrong place at the wrong time," Def. Mem. at 21, and that he was a "part time fringe player." The government respectfully submits that the defendant's minimization and seeming failure (or refusal) to recognize the seriousness of his conduct raises his risk of recidivism. A sentence that provides significant deterrence is warranted.

Additionally, the court should strongly consider the need for general deterrence. As Judge Garaufis has observed, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." United States v. Johnson, No. 16-CR-457 2018 WL 1997975, at *5 (E.D.N.Y. April 27, 2018) (Garaufis, J.); see also United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259) ("Congress viewed [general] deterrence as 'particularly important in the area of white collar crime.'"); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). This is true, in part, because "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." Johnson, 2018 WL 1997975 at *5; see also Martin, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks and citation omitted)); Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("Since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").

The need for general deterrence is particularly acute where the crime involves the abuse of a professional privilege – in this case, the defendant's role as a licensed pharmacist with an expertise in pharmacy management. The deterrent effect of a significant sentence of imprisonment in this case would therefore be particularly valuable, as it would illustrate to licensed medical professionals that fraud and money laundering will have very real consequences.

V.     Restitution and Forfeiture

The government respectfully requests that the Court order the defendant to pay restitution in the amount of $1,352,941, consisting of claims paid by Medicare and Medicaid to A Star in connection with the conspiracy, in accordance with the Mandatory Victim Restitution Act and the plea agreement. See 18 U.S.C. § 3663A; Plea Agreement ¶ 1(e); PSR ¶¶ 45, 117. Additionally, in the parties' plea agreement, the defendant agreed to the imposition of a forfeiture money judgment in the amount of $338,235.27, which reflects the defendant's proceeds from the conspiracy, pursuant to 18 U.S.C. § 982(a)(7). (Plea Agreement ¶ 6; PSR ¶ 123.) The Court signed the Order of Forfeiture on May 13, 2024. (ECF No. 38.) Accordingly, the government respectfully submits that the Court should issue the proposed Order of Restitution attached hereto as Appendix B, and requests that the Court incorporate that Order and the Order of Forfeiture into the judgment of conviction.

VI. Conclusion

For all the reasons articulated above, the government respectfully requests that the Court sentence the defendant to a term of imprisonment between 30 and 37 months and to pay restitution and criminal forfeiture in the amount and manner set forth above.

Respectfully submitted,

GLENN S. LEON
Chief
Criminal Division, Fraud Section
United States Department of Justice

By: /s/ Miriam L. Glaser Dauermann
Miriam L. Glaser Dauermann
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
(718) 254-7575

cc: David M. Eskew, Esq. (counsel to defendant) (by email and ECF)
U.S.P.O. Meghan Wing (by email and ECF)



U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MGD
F. #2021R00825

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 24, 2024

<u>By Email</u>

Probation Officer Meghan Wing
United States Probation Office
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. Chi Kwan Wong</u>
              Criminal Docket No. 23-88 (HG)

Dear Officer Wing:

      The government writes in response to objections to the Pre-Sentence Investigation Report ("PSR") filed on May 2, 2024 by defendant Chi Kwan Wong (the "Objections"). The government opposes the Objections and respectfully requests that no amendments be made to the PSR, apart from the typographical errors noted with respect to Paragraphs 35 and 94/113 of the PSR. Objections at 4, 6.[1]

      <u>Objections to Individual Paragraphs</u>

      Paragraphs 15, 25-31: Wong's Objections to Paragraphs 15 and 25 through 31 take issue with the phrasing of paragraphs in which Wong is not named. In particular, Wong requests that these paragraphs describing the conduct of other defendants be revised to state explicitly that Wong was not involved in the conduct recited in those paragraphs. The government opposes these revisions, as the revisions are unnecessary and needlessly complicate the PSR. The PSR was carefully drafted to specify the individual defendants implicated in each aspect of the fraud, and Wong is named in the paragraphs that refer to his conduct. There is no need to specify in the remaining portions of the factual background that Wong was not involved in the conduct being described.

      Paragraph 20: Wong objects to the word "purported" as applied to his role as consultant at A Star. It is the government's position that he was actively involved in the running

---

      [1] The government takes no position on the amendment requested to Paragraph 108.

and management of the pharmacy as a co-conspirator and that his "consultant" role was meant, at least in part, to cover up his true position. The government opposes the requested revision.

Paragraphs 32: Wong requests that the PSR specify that the information he provided to co-conspirator Maggie Chen and others was publicly available and provided "at the[] request" of his co-conspirators. He further requests that the PSR reflect that he "did not directly participate" in certain aspects of the fraud. As to the first request, whether or not the information was publicly available is irrelevant. Wong is not charged with a crime having to do with the source of his information. It is what Wong did with that information that was the crime: he used his extensive and specialized pharmaceutical knowledge to sift and distill available pricing information so that the pharmacy could fraudulently bill for the most lucrative drugs possible. Further, the specific aspects of the fraud in which Wong participated are not at issue: Wong faithfully and industriously carried out his role in the fraud, which required, among other things, his particular expertise in parsing information on pharmaceutical pricing. The requested amendments would confuse the nature of Wong's criminal conduct and should be denied.

Paragraphs 35 and 47: The PSR correctly states that Wong was involved in the dispensing of medically unnecessary prescriptions. His role in the conspiracy was, among other things, to direct his co-conspirators to expensive medications that could be prescribed to the pharmacy's customers. Wong admitted during his plea allocution that he was aware that Chen, an employee at the medical clinic where co-conspirator Dr. John Yiu worked, was receiving money from both pharmacies and was helping the pharmacies obtain prescriptions from doctors at the clinic. Plea Transcript ("Tr.) at 23. The evidence in the case shows that Wong and Chen both participated in a group text chat for A Star Pharmacy "staff," along with other co-conspirators, and that Wong used that chat to alert his co-conspirators to potentially lucrative pharmaceuticals. He generally tagged those text messages for Chen's attention. See Ex. 1 (Wong text messages with tag "@maggie"). Wong also admits that he knew that the pharmacy then obtained prescriptions for the exact drugs that he recommended to Chen and his other co-conspirators. Objections at 4. His claim that he nonetheless formed no view as to the medical necessity of the prescriptions, id., is simply not credible.

Paragraph 36: Wong requests that the PSR reflect that he did not directly pay bribes and kickbacks to A Star Pharmacy's customers and that the scheme predated his tenure at A Star Pharmacy. However, Wong has repeatedly admitted that he knew customers at A Star Pharmacy were being paid to induce them to fill prescriptions at the pharmacy. Tr. at 22-26, Objections Ex. A at 5. He has further admitted that he agreed with A Star's owners to participate and assist them in the scheme. Tr. at 26. Whether Wong personally paid the bribes and kickbacks or agreed with others to do so, he facilitated the illegal payments and should be held responsible for them. Moreover, whether Wong agreed to join an existing scheme or whether he was involved in its origination is irrelevant to his culpability. The government opposes the requested revision.

Paragraph 41: Wong argues that he was not involved in the "creation" of checks and invoices. As with several of Wong's other objections, Wong is attempting to tie his culpability to what he physically did, rather than on what he agreed to have happen as part of a conspiracy. That is not the correct analysis. As Wong appears to concede by deeming the checks "illegitimate," Wong was aware that the checks from Zhu were for fake expenses and

were meant to generate cash for the pharmacy. Wong was carrying out his role in the conspiracy by passing the laundering checks to co-conspirators and returning the cash to Zhu. It is irrelevant whether he physically made out the checks and faked the invoices or simply knew and agreed that such documents would be created. The government accordingly opposes the proposed revision because the original text is accurate.

Paragraphs 45: Wong requests that the PSR specify that the information he provided to Chen and others was publicly available. The government has already addressed this issue and opposes Wong's requested revision to paragraph 45.

Paragraph 46: Wong takes issue with the PSR's statement that he had a "proprietary interest in the scheme." Objections at 5. However, by Wong's own admission, the PSR is accurate. Wong stated in his proffer that he "believed he would be paid 'according to what they [i.e., A Star's on-paper owners, Hon, Chen and Zhu] get," and that he "thought he would be paid the same amount as the owners." Objections Ex. A at 3. In other words, Wong expected and believed that he would have a 25% equity share in A Star and would be financially treated as an owner. He had the same incentive as any of the on-paper owners of the pharmacy to increase profits in any way possible, and his fraudulent conduct was a significant source of that profit. Wong therefore had a "proprietary interest in the scheme" and the PSR should not be amended on that point.

Mitigating Role Adjustment

Wong contends that he is entitled to a two-level reduction under Section 3B1.2 of the Guidelines for having been only a "minor participant" in the "criminal activity." Objections at 6. Because Wong was a significant and integral participant in the criminal conduct, the requested reduction should be denied.

The Guidelines set forth a five-prong test for whether a mitigating role adjustment should be applied. No one factor is dispositive, and the list is "non-exhaustive." U.S.S.G. § 3B1.2, cmt. 3(C). The five factors are as follows: (1) the degree to which the defendant understood the scope and structure of the criminal activity; (2) the degree to which the defendant participated in planning or organizing the criminal activity; (3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (5) the degree to which the defendant stood to benefit from the criminal activity.

Considering the factors set forth in the Guidelines, individually and as a whole, Wong should not receive a minor role adjustment. As to the first and second factor, Wong was well aware of the nature and scope of the conspiracy. By his own admission, he knew that patients came to the pharmacy in exchange for illegal kickbacks and bribes and he knew that the information he provided his co-conspirators regarding lucrative pharmaceuticals resulted in prescriptions for those drugs being sent to the pharmacy. As discussed above, his assertion that he had no idea how his co-conspirators were obtaining those prescriptions is simply not credible – or, alternatively, would have required a level of willful blindness that equates to actual

3

knowledge. Indeed, as Wong argues, the action of providing pricing information is not in and of itself illegal. What made it illegal was Wong's intent in taking the action. Wong intended, by providing the pricing information, to set in motion a chain of events that would unlawfully procure prescriptions – and therefore profit – for the pharmacy. Wong pleaded guilty to knowingly participating in this conspiracy, and he cannot now claim that he did not know that the information he provided would be used illegally.

As to the third and fourth factors, Wong's role in the conspiracy was significant and sustained, lasting over four years, and his involvement was critical to the scheme's success. Wong, a pharmacist of nearly a decade's standing, used his experience and specialized knowledge to review pharmaceutical pricing information, with the purpose of determining the most lucrative drugs for reimbursement and providing that information to his co-conspirators so that they could procure prescriptions for those drugs. Nor was he a minor player who was simply "following orders" from his co-conspirators. Rather, he exercised discretion and authority over the information that he offered to his co-conspirators, flagging for them the drugs that he himself decided would be worth integrating into the scheme. Without Wong's active, constant and intelligent participation, the scheme would have failed.

As to the fifth factor, Wong had a strong proprietary financial interest in the scheme: when he entered the conspiracy he agreed to an equal rate of compensation with the other co-conspirators, and his compensation was tied to the profits of the pharmacy, which in turn rose and fell with the success of the conspiracy.[2]

---

[2] As Wong notes, Def. Mem. at 3, the Guidelines state that "a defendant in a healthcare fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, may receive" a mitigating role adjustment. U.S.S.G. § 2B1.1, Application Note 3(A) (emphasis added). The phrasing of the Guidelines makes clear that, even in the case of a pure nominee owner with no further involvement in the scheme, a mitigating role adjustment is not mandatory. But more importantly, an adjustment is not appropriate where, as here, Wong's role was integral to the conspiracy and he was more active than that of a mere nominee owner. See, e.g., United States v. Nachamie, 121 F. Supp. 2d 285, 295 (S.D.N.Y. 2000) ("While the doctors were certainly less culpable than other participants in the Nachamie scheme, they were not substantially less culpable than the average participant in a Medicare fraud. . . . [T]he scheme could not operate without doctors. They played an absolutely essential role. . . . Given this irreducible role, I cannot conclude that their role in this scheme was either minor or minimal.").

Because Wong does not satisfy any of the five prongs of the Guidelines' mitigating role rubric, the government respectfully requests that his application for a minor role adjustment be denied.

          Respectfully submitted,

          BREON PEACE
          United States Attorney
          Eastern District of New York

          GLENN S. LEON
          Chief, Fraud Section
          Criminal Division
          United States Department of Justice

By:   /s/ Miriam L. Glaser Dauermann
          Miriam L. Glaser Dauermann
          Trial Attorney
          United States Department of Justice
          Criminal Division, Fraud Section
          (718) 254-7575

cc:     David Eskew, Esq. (by email)



CONFIDENTIAL

DOJ_0067223



07.10.2019       7:33PM       MAGGIE

CONFIDENTIAL DOJ_0067237


CONFIDENTIAL
DOJ_0067311

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA             <u>ORDER OF RESTITUTION</u>

   – against –                               Criminal Docket No. 23-cr-88

CHI KWAN "KEN" WONG,

              Defendant.

- - - - - - - - - - - - - - - - - - X

WHEREAS, defendant CHI KWAN "KEN" WONG pleaded guilty on January 8, 2024, in the above-captioned case,

1. This order of restitution will be incorporated by reference to the Judgment and Commitment Order to be filed in connection with the above-captioned case.

2. The defendant is directed to pay restitution to the victim named and in the amount listed in Exhibit A to this order.

3. Restitution is due immediately. The total restitution amount to be paid is $1,352,941 plus interest. *See* 18 U.S.C. § 3612(f). Monthly payments shall be made to the Clerk of the Court, United States District Court, 225 Cadman Plaza East, Brooklyn, N.Y. 11201. The payment instrument shall reference the case name and number, as set forth above.

4. The defendant is jointly and severally liable for the restitution judgment with other individuals to be determined.

5. The Clerk is directed to distribute restitution payments to the victim at least once per year to the extent funds are available to distribute. The United States Department of Probation and the United States Attorney's Office are directed to provide to the Clerk whatever assistance is necessary to assure prompt distribution of restitution payments. The Clerk is directed to mail a copy of the instant document and the attachment to the Criminal Trial

Attorney assigned to the instant case and the Financial Litigation Unit of the United States Attorney's Office of the Eastern District of New York.

Dated:    Brooklyn, New York
          October ___, 2024

                                             _____
                                             HONORABLE HECTOR GONZALEZ
                                             UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X

UNITED STATES OF AMERICA         Criminal Docket No. 23-cr-88

    - against -

CHI KWAN "KEN" WONG,

               Defendant.

------------------------------X

## EXHIBIT A TO ORDER OF RESTITUTION

| VICTIM NAME AND ADDRESS | LOSS AMOUNT |
|---|---|
| (1) Centers for Medicare and Medicaid Services<br>Division of Accounting Operations<br>P.O. Box 7520<br>Baltimore, MD 21207-0520 | $1,352,941.00 |
| Total Restitution | $1,352,941.00 (plus interest) |